## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

    vs.                                Cr. No. 13-4064 JCH

ISAAC ALVARADO and
TRAVIS NAU,

      Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' *Motion To Suppress Evidence Collected by U.S.C. Title 10 Active Duty Army Investigators*.[1]  [Docs. 22, 36-37]  The Government filed a response [Doc. 32], and Defendants filed replies [Docs. 34, 38].  Supplemental briefs were filed.  [Docs. 53, 56]  At an evidentiary hearing on September 16, 2014, the Court heard testimony from Defendants' witnesses Lt. Gen. Ret. Edward D. Baca, Mario Tafoya, and Henry Garcia Salas, in addition to Government witness Russell Rhodes.  The Court admitted six defense exhibits, and two Government exhibits.[2]  Having reviewed the motion, briefs, evidence, and relevant law, the Court concludes that the motion should be denied.

## BACKGROUND

Defendant Isaac Alvarado is a retired Colonel in the New Mexico Army National Guard, who served as a Recruiting Assistant for the Guard Recruiting Assistant Program ("G-RAP").

---

[1] Alvarado filed the motion.  [Doc. 22]  The Court granted Nau's unopposed motion to join in that motion.  [Docs. 36-37]
[2] At the Court's request [Tr. 9-16-14, pp. 182-83], the Government later submitted as an exhibit a hard copy of Army Regulation 10-87 [Doc. 74-1], previously cited in the Government's response to Defendants' suppression motion [Doc. 32, p. 4].

G-RAP was a program designed to increase enlistment in the Army National Guard, paying referral bonuses for each civilian recruited.  The National Guard Bureau hired a civilian corporation, Docupak, to oversee day-to-day operations of the G-RAP program.

Defendant Travis Nau, Alvarado's son-in-law and a Sergeant First Class in the New Mexico Army National Guard, was employed as an assistant in the Recruit and Retention Office of the Guard Armory in Albuquerque.  Nau was responsible for helping persons enlist in the National Guard, and had access to the names and personal information of potential recruits.  As a paid recruiter, Nau was not eligible to participate in G-RAP.

According to the indictment, Defendants used information about enlistees obtained by Nau in the course of his employment and made entries into Alvarado's online G-RAP account fraudulently showing that Alvarado had recruited the enlistees.  [Doc. 2]  Between February 2008 and February 2012, Defendants are alleged to have defrauded the United States of about $12,000.  Nau is alleged to have instructed some enlistees to falsely state, in the event of an inquiry, that they had been recruited by Alvarado.

Defendants were each indicted on nine counts:  Count 1—Conspiracy to commit wire fraud, contrary to 18 U.S.C. § 371 and 18 U.S.C. § 1343; Counts 2-5—Wire fraud, contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 2; and Counts 6-9—Aggravated identity theft, contrary to 18 U.S.C. § 1028A(a)(1) and 18 U.S.C. § 2.  [Doc. 2]

The investigation leading to these charges was conducted by active duty Army soldiers in the U.S. Army Criminal Investigation Command, USACIDC ("Army CID").  Defendants allege that the Army investigators gathered evidence by surveillance and interviews, along with subpoenas for bank accounts and internet accounts.

## <u>LEGAL STANDARDS</u>

The primary task in statutory construction is to determine the intent of Congress.  *United Keetoowah Band of Cherokee Indians v. U.S. Dep't of Housing & Urban Dev.*, 567 F.3d 1235, 1241 (10th Cir. 2009).  The court begins with the plain language of the statute, assuming that the ordinary meaning of the words conveys congressional intent.  *United States v. Albert Inv. Co., Inc.*, 585 F.3d 1386, 1394 (10th Cir. 2009).  The words of the statute must be read "in their context and with a view to their place in the overall statutory scheme."  *In re Kunz*, 489 F.3d 1072, 1077 (10th Cir. 2007).  If Congress has directly addressed the precise question at issue and the intent of Congress is clear, "'that is the end of the matter.'"  *Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).

But if Congress has not directly addressed the precise question at issue, and Congress has explicitly delegated authority to an agency to "'elucidate'" statutory provisions by regulation, "'[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'"  *Id.* (quoting *Chevron*, 467 U.S. at 843-44).  The court does not impose its own construction on the statute, as it would in the absence of such administrative interpretation.  *Id.*  The question is whether the agency's construction of the statute is permissible—not whether the agency's interpretation is the one the court would have adopted, or the one that the court thinks is the best.  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 729-30 (10th Cir. 2006).

As proponents of the motion to suppress, Defendants ordinarily bear the burden of proof.  *See United States v. Esser*, 451 F.3d 1109, 1112 (10th Cir. 2006); *United States v. Garcia*, 707 F.3d 1190, 1196 n.4 (10th Cir. 2013).

## DISCUSSION

Defendants argue that Army criminal investigators illegally acted as "principal investigators of civilian criminal activity" when they conducted interviews and interrogations, obtained subpoenas for bank records, and conducted surveillance of Defendants. [Doc. 22, p. 1; Doc. 34, p. 3]  Defendants move to suppress all evidence collected, arguing that the Army criminal investigators are part of the Army, that Defendants are to be treated as civilians, and therefore the Posse Comitatus Act ("PCA") prohibited the Army from investigating Defendants. Defendants argue that, although the exclusionary rule is not generally the remedy for PCA violations, upon proof of "widespread or repeated" violations a court could consider itself free to apply the exclusionary rule as a "future deterrent." [Doc. 22, p. 4 (quoting *United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005)]

The Government responds that there was no PCA violation because there was an "independent military purpose" for the investigation of alleged fraud against the Army, resulting in loss of federal military funds; the independent military purpose derives from the nature of the crime, not the status of the individuals investigated. [Doc. 32, pp. 2-5; Doc. 56, pp. 2-3]  The Government further argues that, even if there were a PCA violation, the exclusionary rule is not the remedy, and Defendants have not shown "widespread and repeated violations." [Doc. 32, p. 5]

## I.  PCA Violation

"Posse comitatus" means literally "the power of the county"—defined at common law as all those over the age of fifteen upon whom a sheriff could call for assistance in preventing any type of civil disorder. *United States v. Hartley*, 796 F.2d 112, 114 n.3 (5th Cir. 1986).  The PCA was enacted at the end of Reconstruction for the purpose of "limit[ing] the direct active use of

4

federal troops by civil law enforcement officers to enforce the laws of this nation." *United States v. Hutchings*, 127 F.3d 1255, 1257 (10th Cir. 1997) (internal quotation marks omitted); *see Applewhite v. United States Air Force*, 995 F.2d 997, 1001 (10th Cir. 1993) ("The Posse Comitatus Act is clearly designed to restrict military involvement in civilian law enforcement."). The PCA is intended "'to uphold the American tradition of restricting military intrusions into civilian affairs, except where Congress has recognized a special need for military assistance in law enforcement.'" *Johnson*, 410 F.3d at 146-47 (quoting *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995)); *see Laird v. Tatum*, 408 U.S. 1, 15 (1972) (observing "deep roots" in American history of "traditional and strong resistance … to any military intrusion into civilian affairs").

## A.  Statutory and regulatory framework

The PCA does not limit the military's ability to investigate and punish active-duty soldiers. *See Applewhite*, 995 F.2d at 1001; *United States v. Lewis*, 505 Fed. Appx. 1, 2 (D.C. Cir. 2013) (per curiam) (unpublished)[3]; *Chang-Williams v. United States*, 965 F. Supp. 2d 673, 689 (D. Md. 2013). It is undisputed, however, that Alvarado and Nau were not on active duty at the times relevant to these offenses. *See Hutchings*, 127 F.3d at 1258 ("Guardsmen do not become part of the Army itself until such time as they may be ordered into active federal duty by an official acting under a grant of statutory authority from Congress."). The Government does not contend that Defendants were in a position different from any civilian with respect to the PCA.

The Posse Comitatus Act provides:

> Whoever, except in cases and under circumstances expressly authorized
> by the Constitution or Act of Congress, willfully uses any part of the Army or the

---

[3] The Court cites this and other unpublished opinions for their persuasive value.  *See* 10th Cir. R. 32.1(A).

> Air Force as a posse comitatus or otherwise to execute the laws shall be fined
> under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385.  The PCA was enacted in 1878.  Army Appropriations Act, ch. 263, § 15, 20

Stat. 145, 152 (1878).  Concerned that the PCA was "'sufficiently ambiguous'" to cause denial of

permissible aid to civilian law enforcement, in 1981 Congress clarified the PCA by enacting

general law enforcement exceptions which expressly grant authority for military assistance to

civilian law enforcement under some circumstances:  the Military Support for Civilian Law

Enforcement Agencies Act, codified at 10 U.S.C. §§ 371-378.[4]   *Johnson*, 410 F.3d at 147

(quoting H.R. Rep. No. 97-71, pt. 2, at 3 (1981)); *see United States v. Dreyer*, 767 F.3d 826, 830

(9th Cir. 2014); Charles Doyle & Jennifer K. Elsea, Cong. Research Serv., No. 7-5700, *The

Posse Comitatus Act & Related Matters:  The Use of the Military To Execute Civilian Law* 41

(2012), *available at* fas.org/sgp/crs/natsec/R42659.pdf [hereinafter Doyle, *The Posse Comitatus

Act*].

Included in the 1981 Military Support for Civilian Law Enforcement Agencies Act is an

express grant of authority to the Secretary of Defense to prescribe regulations to elucidate the

statutory provisions of the PCA:

> The Secretary of Defense shall prescribe such regulations as may be
> necessary to ensure that any activity (including the provision of any equipment or
> facility or the assignment or detail of any personnel) under this chapter does not
> include or permit direct participation by a member of the Army, Navy, Air Force,
> or Marine Corps in a search, seizure, arrest, or other similar activity unless
> participation in such activity by such member is otherwise authorized by law.

10 U.S.C. § 375.  Pursuant to this authority, the Department of Defense ("DoD") issued DoD

Directive 5525.5, *DoD Cooperation with Civilian Law Enforcement Officials* (Jan. 15, 1986),

*available at* fas.org/irp/doddir/dod/d5525_5.pdf.  Directive 5525.5 was the regulation in effect at

---

[4] Congress later enacted further exceptions.  10 U.S.C. §§ 379-382.

6

the time of the fraud alleged against Defendants.[5]  This regulation creates "an <u>exception</u> to the

[PCA's] general prohibition on direct involvement" by the military when there is an "independent

military purpose."  *United States v. Hitchcock*, 286 F.3d 1064, 1069 (9th Cir.) (emphasis added),

*as amended by* 298 F.3d 1021 (9th Cir. 2002); *see Dreyer*, 767 F.3d at 833.  The regulation

establishes that the PCA does not proscribe direct military involvement in civilian law

enforcement activities when "the military participation is undertaken 'for the <u>primary purpose of</u>

---

[5]DoD Directive 5525.5 was incorporated into and canceled by DoD Instruction 3025.21, *Defense Support of Civilian Law Enforcement Agencies* (effective 2-27-13), *available at* www.dtic.mil/whs/directives/corres/pdf/302521p.pdf. The relevant provisions of 3025.21 and 5525.5 are substantially similar.  *See Dreyer*, 767 F.3d at 830 n.8.  The relevant provisions of DoD Instruction 3025.21 are codified as 32 C.F.R. § 182.6 (2013):

(a)  Participation of DoD Personnel in Civilian Law Enforcement Activities—

(1)  Guiding Statutory Requirements and Supporting Policies—

    (i)  Statutory Restrictions.

        (A)  The primary restriction on DoD participation in civilian law enforcement activities is the Posse Comitatus Act. . . . .

        (B)  10 U.S.C. 375 provides that the Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment of facility or the assignment or detail of any personnel) under 10 U.S.C. chapter 18 does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

    (ii)  Permissible Direct Assistance.  Categories of active participation in direct law-enforcement-type activities (e.g., search, seizure, and arrest) that are not restricted by law or DoD policy are:

        (A)  Actions taken for the <u>primary purpose of furthering a DoD or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities.</u>  This does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of the Posse Comitatus Act.  Actions under this provision may include (depending on the nature of the DoD interest and that authority governing the specific action in question):

            (1)  Investigations and other actions related to enforcement of the Uniform Code of Military Justice (10 U.S.C. chapter 47).
            . . . .
            (5)  Protection of DoD personnel, equipment, and official guests.
            (6)  Such other actions that are undertaken <u>primarily for a military or foreign affairs purpose.</u>

32 C.F.R. § 182.6 (emphasis added).

furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities.'"  *Hitchcock*, 286 F.3d at 1069 (quoting DoD Directive 5525.5, § E4.1.2.1) (emphasis added).

Directive 5525.5 then specifically lists a number of activities that are not restricted by the PCA, because they are taken for the primary purpose of furthering a military interest, including: investigations and other actions related to the enforcement of the Uniform Code of Military Justice; investigations and other actions likely to result in administrative DoD proceedings; investigations and other actions related to the commander's inherent authority to maintain law and order at a military facility; protection of classified military information or equipment; protection of DoD personnel, DoD equipment, and official DoD guests; and "[s]uch other actions that are undertaken primarily for a military or foreign affair's purpose."  DoD Directive 5525.5, § E4.1.2.1 (emphasis added).  The emphasized catchall exception allows activities similar to those specifically listed.

In the case before the Court, Army CID conducted an investigation into conduct alleged to constitute fraud against the military, leading to charges against Defendants under civilian laws.  The "primary purpose" exception (quoted and emphasized above) could cover the Army CID's investigation and other activities in this case.

Without referring to these DoD regulations, the Tenth Circuit held in *Applewhite* that when there is an "independent military purpose," there is "necessarily" no PCA violation.  *Applewhite*, 995 F.2d at 1001.  In *Applewhite*, the Air Force Office of Special Investigations conducted an undercover drug "sting operation" aimed at off-base buys by active-duty airmen.  *Id*. at 998.  Airman Applewhite made a buy of illegal drugs; his civilian wife accompanying him was searched and then taken to the military base along with her husband, where she was partially

8

strip-searched.  *Id*. at 999.  Testimony conflicted on whether the wife was merely aware of her husband's illegal buy or actively participated in it.  *Id*.  The wife filed a *Bivens* action for damages, including a claim of a PCA violation.  *Id*.  The Tenth Circuit held that it was reasonable to search and remove the wife to the base.  The PCA "is not intended to limit the military in preventing illicit drug transactions by active duty military personnel, whether such conduct occurs on or off a military installation."  *Id*. at 1001.  The purpose was to "sting" military personnel like Airman Applewhite, not civilians; since there was an "independent military purpose," there was "necessarily no wilful use of any part of the Air Force as a posse to execute civilian laws" and no PCA violation.  *Id*. at 1000-01.  The Tenth Circuit related that, after the civilian wife was taken to the military base, the Albuquerque Police were contacted but declined to investigate her; the military authorities then released her.  *Id*. at 999.

*Applewhite* holds that there is no PCA violation when a civilian is swept up in a military investigation of illegal drug purchases by active-duty military personnel, even when the site is off-base.  The Tenth Circuit did not need to decide whether there would be a PCA violation if the targets of the investigation were civilians instead of active-duty personnel.[6]  The cases cited in *Applewhite* also involved investigations aimed solely at active-duty military personnel; further, in both cases the person claiming a PCA violation was an active-duty sailor or soldier.  *Hayes v. Hawes*, 921 F.2d 100, 103 (7th Cir. 1990) (per curiam) (holding there was no violation of § 1385 or § 375, in joint sting operation with purpose of investigating off-base illegal drug purchases by active-duty sailors, when there was limited military involvement and independent military purpose, and person apprehended was active-duty sailor); *Harker v. State*, 663 P.2d 932, 933-37 (Alaska 1983) (holding there was no PCA violation, when military officer investigating robbery

---

[6] Nor did the Tenth Circuit decide—as Defendants argue—that the military could not seize and search a civilian, off-base; Defendants quote the district court opinion, which was reversed.  [Doc. 22, p. 3]  *Applewhite* provides no support for Defendants' suppression motion.

report stopped and searched, on base, the car in which defendant (an active-duty soldier) was passenger; there was independent military interest and no violation of PCA principle when military acted independently without request for aid from civilian law enforcement).

Consideration of *Applewhite* and the cases on which it relied shows that the Tenth Circuit held there is an "independent military purpose" exception to the PCA, but in all three cases the targets of the military investigation were active-duty military personnel.  Because the reach of the *Applewhite* exception is unclear, and because *Applewhite* did not address military investigations when the only targets are civilians, the Court proceeds to consider the DoD regulations.

### B.  Judicial deference to DoD regulations

The Court must first determine whether DoD Directive 5525.5 is a valid regulation implementing the PCA.  *See Hackworth*, 468 F.3d at 726.  The first step in the *Chevron* analysis is whether Congress "has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 843.  In making this determination, the Court employs the traditional tools of statutory construction, including consideration of the statutory text, history, and purpose.  *Harbert*, 391 F.3d at 1147.  If congressional intent were clear, the Court's analysis would end and the Court would simply give effect to Congress's intent.  *See Hackworth*, 468 F.3d at 727 (observing that judiciary is final authority on statutory construction and must reject administrative constructions if contrary to "clear congressional intent").  But the Court concludes that congressional intent is ambiguous on the precise question at issue.

It is not clear what the terms mean when the PCA prohibits "use" of the Army or Air Force "to execute the laws," or how far the PCA prohibition reaches.  *See Chevron*, 467 U.S. at 844-45 (discussing situation when meaning or reach of statute is unclear); *United States v.*

*Hutchings*, 127 F.3d 1255, 1257 (10th Cir. 1997) (assuming without deciding that peripheral military involvement would violate PCA).  This language could be broadly interpreted to mean that any military participation in enforcement of civilian laws is prohibited, or that use of the military with the specific and primary purpose of enforcing the civilian laws is prohibited.  The history and purpose of the PCA provide some support for the latter interpretation—that Congress intended to limit the use by civilian authorities of the military to assist civilian police in performing their own functions and duties; this is the use that stimulated passage of the PCA. *See* Doyle, *The Posse Comitatus Act* 53-54 (citing congressional debate regarding use of Army "essentially as a police force"); *Dreyer*, 767 F.3d at 830 n.7 (stating that purpose of PCA was to eliminate the direct active use of military by civil law authorities to enforce the civil law); *see also Applewhite*, 995 F.2d at 1001 (approving of some military enforcement of civilian laws). The term "posse comitatus" in the statute refers to a civilian law enforcement authority (the sheriff) calling up the military to aid in accomplishing the civilian law enforcement authority's own purpose.  *See Hartley*, 796 F.2d at 114 n.3; *United States v. Al-Tabib*, 55 F.3d 923, 929 (4th Cir. 1995)  (describing CA's purpose as preventing "intrusion" of military into civilian affairs).

The Court concludes that congressional intent is not clear on the precise question at issue: whether the PCA prohibits a military investigation of civilians when the military is acting for its own purposes—and not with an intent to assist, and pursuant to a request from, civilian law enforcement.  *See Hackworth*, 468 F.3d at 726; *Harker*, 663 P.2d at 933-37 (cited with approval in *Applewhite*, 995 F.2d at 1001) (holding, as one reason there was no PCA violation, that military acted independently—without request for aid from civilian law enforcement).  Congress itself acknowledged that the PCA was "ambiguous."  H.R. Rep. No. 97-71, pt. 2, at 3; *see Johnson*, 410 F.3d at 147; Doyle, *The Posse Comitatus Act* 41, 53-54.  It was to clarify the PCA

that Congress enacted the 1981 exceptions and expressly authorized the Secretary of Defense to prescribe regulations to elucidate the statute. *Id*.; 10 U.S.C. § 375.

Since Congress has not "directly spoke[n] to the precise question at issue," the Court proceeds to the second step in the *Chevron* analysis: whether DoD's regulation is a permissible construction of the PCA. *Hackworth*, 468 F.3d at 727. Since Congress explicitly delegated authority to the DoD to "elucidate" the PCA, Directive 5525.5 must be "given controlling weight unless [it] is arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. DoD's regulation need not embody the only possible interpretation, or the interpretation this Court would independently reach. *See id*.

The Court concludes that DoD Directive 5525.5 is reasonable and furthers congressional intent. First, the Directive is a plausible and reasonable reading of the PCA; § 1385 is reasonably interpreted as proscribing use of the military when the primary purpose is execution of civilian laws, rather than for another purpose (*i.e.*, a military or foreign affairs purpose). Second, the Directive furthers the congressional intent to prohibit only "intrusion" of the military into civilian law enforcement and "use" of the military by civilian law enforcement as essentially a police force to perform the functions and duties assigned to civilian law enforcement. Third, although the Tenth Circuit did not discuss Directive 5525.5, the *Applewhite* Court upheld one of the critical principles: that there is no PCA violation when there is an "independent military purpose." *Applewhite*, 995 F.2d at 1001. The Court concludes that *Applewhite*'s "independent military purpose" means essentially the same thing as "primary purpose of furthering a military" function in the regulation. *See* Directive 5525.5, § E4.1.2.1 ("primary purpose of furthering a military" function); *id*. § E4.1.2.1.6 ("actions that are undertaken primarily for a military … purpose"); *see Hitchcock*, 286 F.3d at 1070 (equating "independent military purpose" with

12

Directive 5525.5's "primary purpose" exception).  Fourth, a line of Ninth Circuit opinions—including the recent *Dreyer* case—upheld DoD Directive 5525.5 as a valid regulation elucidating the PCA and expressing the "independent military purpose" exception.  *United States v. Chon*, 210 F.3d 990, 994 & n.3 (9th Cir. 2000); *Hitchcock*, 286 F.3d at 1070; *Dreyer*, 767 F.3d at 833.

### C.  Application of "independent military purpose" exception

Since the Court concludes that DoD Directive 5525.5 is a valid regulation, the next question is whether the Army CID actions in Defendants' case fall within the "independent military purpose" exception.  After consideration of the testimony and exhibits presented, the Court concludes that the independent military exception applies here.

### (1)  Fraud undermining National Guard recruitment

Defendants recognize the importance of National Guard recruitment at a time when the Army was struggling to meet its recruitment goals and National Guard units were needed to support the wars in Afghanistan and Iraq; Defendants presented as an exhibit a Subcommittee Report stating that the purpose of G-RAP was to remedy these problems.  [Doc. 53, p. 5; Exhibit B (Doc. 53-2), p. 1 (admitted at 9-16-14 hearing)]  It was because of these military interests that the G-RAP program was established.  [Doc. 53, p. 5; Exhibit B, p. 1]  Army National Guardsmen can be called into active duty to serve in the Army; they constitute a reserve component of the Army.  [Tr. 9-16-14, pp. 12-13, 18, 32-33]  The purpose of the G-RAP program was to provide incentives to aid in obtaining enlistment; "the program worked" and the National Guard began meeting its recruitment goals, with almost 40% of National Guard recruits enlisting through G-RAP.  [Exhibit B, pp. 1-2]

The Government argues that "G-RAP—a program designed to recruit new soldiers into the military during wartime—directly concerns the United States Department of Defense

("DOD") and, as such, the nation's military."  [Doc. 56, p. 3]  The National Guard is "an integral part of the first line defenses of the United States," 32 U.S.C. § 102, and constitutes one of the reserve components of the Army, 10 U.S.C. § 10105.  *See In re Sealed Case*, 551 F.3d 1047, 1048 (D.C. Cir. 2009).  Congress has declared that the military policy of the United States requires that the Army National Guard be kept up to strength so that Guardsmen can be called into active duty when needed:

### § 102. General policy

> In accordance with the traditional military policy of the United States, <u>it is essential that the strength and organization of the Army National Guard</u> and the Air National Guard <u>as an integral part of the first line defenses</u> of the United States <u>be maintained and assured at all times</u>. Whenever Congress determines that more units and organizations are needed for the national security than are in the regular components of the ground and air forces, the Army National Guard of the United States and the Air National Guard of the United States, or such parts of them as are needed, together with such units of other reserve components as are necessary for a balanced force, shall be ordered to active Federal duty and retained as long as so needed.

32 U.S.C. § 102 (emphasis added).  The Government argues there is "a clear federal military interest justifying Army CID's involvement in a G-RAP fraud investigation."  [Doc. 56, p. 4]

The Court concludes that there is an independent military interest in investigating fraud which undermines a program designed to maintain the strength of the National Guard.  Based on the documents and testimony presented in this case, the Court also finds that the Army CID investigation against Defendants was undertaken for the primary purpose of furthering this military interest.  Additional support for this finding is provided by DoD Directive 5505.2, § 4.4:

> <u>Fraud investigations</u> conducted by the Military Criminal Investigative Organizations (MCIOs) are undertaken for the <u>primary purpose of furthering a function of the Department of Defense</u>.  Accordingly, such investigations are not restricted under 18 U.S.C. 1385, "The Posse Comitatus Act" (reference (f)).

DoD Directive 5505.2, § 4.4 (Feb. 6, 2003) [Exhibit C admitted at 9-16-14 hearing] (emphasis added).[7]

The Government cites Army Regulations to support the conclusion that Army CID was authorized to conduct the investigation against Defendants.   Army Regulations prescribed pursuant to an express grant of congressional authority are entitled to deference under *Chevron*. *See* 10 U.S.C. § 3013(g) (authorizing Secretary of Army to assign, detail, and prescribe duties of members of Army and Army's civilian personnel).   As Special Agent Rhodes testified, a regulation prescribed pursuant to this authority states that the Army CID may investigate crimes in which the Army National Guard is "affected by fraud, theft, diversion, or destruction of U.S. Government funds or property."   Army Regulation 195-2, § 3-3(a)(7) (May 15, 2009, with Rapid Action Revision issued Sept. 6, 2011).[8]   [Tr. 9-16-14, pp. 136-38, 110; Exhibit F]   The Court concludes that this regulation provides some additional, though limited, support.[9]

---

[7] This directive has been reissued as DoD Instruction 5505.02 (Aug. 29, 2013), *available at* www.dtic.mil/whs/directives/corres/pdf/550502p.pdf.   The 2013 version contains substantially similar language: "Fraud investigations conducted by the Military Criminal Investigative Organizations … are undertaken for the primary purpose of furthering Military Department functions.   Accordingly, such investigations are not restricted by section 1385 of Reference (d), also known as the 'Posse Comitatus Act.'"  DoDI 5505.02 § 3(d) (Aug. 29, 2013).

[8] The Government has not provided the Court with the version(s) of this regulation in effect throughout the period of offenses alleged in this case (Feb. 2008 to Feb. 2012), or shown that the regulation was unchanged throughout that period of time.  The Court therefore places only limited reliance on this regulation.

[9] Additional Army Regulations cited by the Government apply if there is an Army interest or an Army program is affected.  *See* AR 195-2, § 3-1(b)(4) (May 15, 2009) (providing that the Army "has investigative authority whenever an Army interest exists and investigative authority has not been specifically reserved to another agency" and clarifies that "an Army interest exists" when the "Army is the victim of the crime; for example, the offense involves the loss or destruction of government property or allegations of fraud … relating to Army programs or personnel"); AR 195-2, Appendix B, Table B-1, p. 29 (May 15, 2009) (stating that Army CID (USACIDC) is responsible for investigating frauds against the U.S. "when the U.S. Army has an interest"); AR 10-87, § 17-2(j)   (Sept. 4, 2007) (granting Army CID (USACIDC) authority to investigation violations of criminal statutes in which Army has or may have an interest).   Since the Court does not find that the Government proved that G-RAP was an "Army program" or operated with Army funds, the Court does not rely on these regulations.

**(2)  Protection and management of military funds**

The Court finds that there was another independent military interest for the Army CID investigation against Defendants:  management and protection of military resources committed to recruiting.  The testimony presented at the September 16, 2014 hearing showed that the G-RAP program was operated with military funds.

Lt. Gen. Ret. Baca testified that the National Guard Bureau is a federal agency which is part of the Department of Defense.  [Tr. 9-16-14, p. 21]  Baca testified that the National Guard Bureau submits its budget to Congress for approval, and then allocates funds to the states; once allocated to the states, the money still belongs to the federal government but is administered by each state.  [Tr. 9-16-14, p. 22]  The funds that the National Guard Bureau receives constitute "federal dollars" and pass through the Army budget office, though they do not constitute Army funds once received by the National Guard Bureau.   [Tr. 9-16-14, pp. 30-31, 40-41, 47] Contracts created by the National Guard—like the G-RAP contract administered by Docupak— are funded by National Guard federal dollars.  [Tr. 9-16-14, p. 31]

Special Agent Rhodes testified that G-RAP's funding came from the National Guard Bureau, which in turn received its funding from Congress "through Army channels."  [Tr. 9-16-14, p. 112-18, 132-33]  Rhodes testified that the Army was defrauded of money when there was PCA fraud, and Army CID was responsible for investigating allegations of fraud against the Army under Army Regulation 195-2.  [Tr. 9-16-14, pp. 134, 124, 127]  On cross-examination, Rhodes agreed that G-RAP was not an Army program, and that funds for G-RAP were allotted to the National Guard Bureau and "just simply flow[ed] through the Army to get to the National Guard Bureau."  [Tr. 9-16-14, pp. 132-34]  Rhodes testified that there was at any rate a nexus to Army interests.  [Tr. 9-16-14, pp. 121-27]

The testimony about the technicalities of Army funds, National Guard Bureau funds, funds flowing through Army channels, differed somewhat.  The Court concludes that it need not address these technicalities; it is sufficient for the Court to find that the G-RAP program was supported by military funds—a finding supported by both Baca's and Rhodes's testimony.

Protection of military funds is similar to the protection of military equipment—an independent military interest explicitly listed in DoD Directive 5525.5 as an activity outside the proscription of the PCA.  Directive 5525.5, § E4.1.2.1.5 ("The following activities are not restricted by" the PCA:  "Protection of DoD personnel, DoD equipment, and official guests of the Department of Defense."); *see* 32 C.F.R. § 182.6(a)(ii)(A)(5).  On this basis, the Ninth Circuit held that there was no PCA violation when NCIS agents investigated theft of trucks and other military equipment from a naval installation; the NCIS agents conducted interrogations, searches, and line-ups—all with civilians as the targets.  *Chon*, 210 F.3d at 994.[10]  Protection of military funds is similar to an activity specifically listed in the Directive as being outside the PCA's proscription; this similarity supports the Court's conclusion that protection of military funds falls within the catchall "independent purpose" exception.  *See* Directive 5525.5, § E4.1.2.1.6 ("Such other actions that are undertaken primarily for a military or foreign affair's purpose").

Based on the testimony and other evidence, the Court finds that the Army CID investigation of Defendants was undertaken "for the primary purpose" of investigating fraud against military funds.  The Court also finds that investigation into fraudulent taking of G-RAP funds constituted an "independent military purpose."

---

[10] Although the PCA does not refer to the Navy, 10 U.S.C. § 375 does, as do DoD regulations.  *See* Directive 5525.5(2).  *Chon* concluded that the Navy was subject to essentially the same restrictions set forth in the PCA. *Chon*, 210 F.3d at 993.

**D. Conclusion on "independent military purpose" exception**

Based on all of the evidence presented, the Court finds that the investigation at issue in this case does not constitute the intrusion of the military into civilian law enforcement; rather, Army CID investigated with the "primary purpose" of furthering "independent military interests."  Although there may be "incidental benefits" to civilian law enforcement, the investigation was not "taken for the primary purpose of aiding civilian law enforcement officials."  DoD Directive 5525.5, § E4.1.2.1.  Instead, the Court finds that the investigation was "undertaken primarily for a military … purpose."  DoD Directive 5525.5, § E4.1.2.1.6.

The Court concludes that the Army CID investigation into G-RAP fraud by Defendants constitutes an "independent military purpose" and is therefore not prohibited by the PCA.  This conclusion is supported by DoD Directive 5525.5 and *Applewhite*.

Additional arguments made by Defendants do not undermine this conclusion.  Citing DoD Instructions, Defendants argue that the Defense Criminal Investigative Service—not Army CID—should have conducted any investigation into contracts awarded by the National Guard Bureau.  [Doc. 53, pp. 6-7; Doc. 53-3, pp. 10-11]  But even if that were so, it would not show a violation of the PCA.  The PCA is concerned with whether it was lawful for any military body at all to be involved; it is irrelevant to the PCA which of several military bodies could or should have investigated.  Similarly, Defendants' assertion that coordination with civilian investigators was required by regulations, and did not occur, would not show violation of the PCA.  [Doc. 53, pp. 7-8; Tr. 9-16-14, pp. 170-72, 177-79]  The presence of an independent military purpose simply takes the activity outside the proscriptions of the PCA; any subsidiary regulations that might apply if there were no independent military purpose are not relevant.

## II.  Remedy

Citing opinions from other jurisdictions, Defendants assert that they have proved not only a PCA violation in this case, but also widespread and repeated violations, and that the Court should suppress all evidence as a remedy.  *See, e.g., United States v. Dreyer*, 767 F.3d 826, 835-37 (9th Cir. 2014); *United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005); *United States v. Walden*, 490 F.2d 372, 377 (4th Cir. 1974).

The Government responds that courts have routinely held that the exclusionary rule is not an available remedy for PCA violations.  *See United States v. Holloway*, 531 Fed. Appx. 582, 583 (6th Cir. 2013); *Gilbert v. United States*, 165 F.3d 470, 474 n.2 (6th Cir. 1999).  *Gilbert* was recently cited by the Tenth Circuit for the proposition that "'every federal court to have considered the issue has held that suppression is not an appropriate remedy for a violation of the Act.'"  *Gonzales v. Bravo*, 561 Fed. Appx. 673, 675 n.3 (10th Cir.), *cert. denied*, 2014 WL 4471126 (U.S. Nov. 10, 2014).  After *Gonzales* was decided, however, the Ninth Circuit did apply the exclusionary rule as a remedy.  *Dreyer*, 767 F.3d at 835-37.

### A.  The exclusionary rule

The exclusionary rule was developed as a "'prudential doctrine'" and "'prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers.'"  *United States v. Vang Lor*, 706 F.3d 1252, 1257 (10th Cir. 2013) (quoting *Davis v. United States*, U.S. ___, ___, 131 S. Ct. 2419, 2426, 180 L. Ed. 2d 285 (2011), and *Stone v. Powell*, 428 U.S. 465, 486 (1976)).  The Fourth Amendment's lack of an integral means of enforcement led to development of the exclusionary rule.  *United States v. Figueredo-Diaz*, 718 F.3d 568, 573 (6th Cir. 2013).  "The exclusionary rule 'has been restricted to those areas where its remedial objectives are thought most efficaciously served.'"  *Vang Lor*, 706 F.3d at 1257 (quoting *Powell*,

428 U.S. at 486-87). Even when there is a Fourth Amendment violation, the exclusionary rule does not automatically apply; instead, the Supreme Court balances the costs against the deterrent effect, as the *Powell* Court did in concluding that the additional deterrent effect was outweighed by substantial social costs. *See id.* (discussing *Powell*, 428 U.S. at 493-94); *see also Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (recognizing costs of setting free guilty and dangerous defendants, and toll on truth-seeking and law enforcement objectives); *United States v. Leon*, 468 U.S. 897, 907 (1984) (recognizing "substantial social costs").

As a general rule, the exclusionary rule is not available as a remedy for statutory violations that do not create fundamental rights unless the statute expressly provides for that remedy. *United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001). Historically, suppression has been available "'only in cases implicating the most fundamental of rights,'" so far limited to violations of the Fourth, Fifth, and Sixth Amendments. *Id.* (quoting *United States v. Li*, 206 F.3d 56, 61 (1st Cir. 2000)). The exclusionary rule is almost never approved as a remedy for a statutory violation, unless Congress prescribed exclusion in the statute:

> Suppression of evidence is strong medicine, not to be dispensed casually. . . . The cases in which the Supreme Court has approved a suppression remedy for statutory violations are hen's-teeth rare, and "[i]n those cases, the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348, 126 S. Ct. 2669, 165 L. Ed. 2d 557 (2006).

*United States v. Adams*, 740 F.3d 40, 43 (1st Cir.), *cert. denied*, 134 S. Ct. 2739 (2014).

## B. Principles of exclusionary rule and PCA

The Tenth Circuit indicated, in a recent unpublished opinion, that "the exclusionary rule does not apply to violations of the PCA." *Gonzales v. Bravo*, 561 Fed. Appx. 673, 677 (10th Cir. 2014), *cert. denied*, ___ U.S. ___, 2014 WL 4471126 (Nov. 10, 2014). The Court quoted with approval a Sixth Circuit opinion which "noted that 'every federal court to have considered the

issue has held that suppression is not an appropriate remedy for a violation of the [PCA].'"  *Id*. at 675 n.3 (quoting *Gilbert v. United States*, 165 F.3d 470, 474 n.2 (6th Cir. 1999) (not reaching the issue of suppression, however)).  Since *Gonzales* is an unpublished opinion, the Court considers the remedy issue further.

The Court concludes for a number of reasons that the exclusionary rule should not be adopted as a remedy for a PCA violation—even if there were a violation in Defendants' case.

First, the exclusionary rule was developed to remedy violations of fundamental constitutional rights.  The exclusionary rule "'was not fashioned to vindicate a broad, general right to be free of agency action not authorized by law, but rather to protect specific, constitutionally protected rights.'"  *Minjares-Alvarez*, 264 F.3d at 986 (quoting *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000)).  The PCA does not create fundamental rights on a par with those established in the Bill of Rights.  *See id.* (holding that Vienna Convention does not create fundamental or constitutional right, so violation does not warrant application of exclusionary rule).  Nor is the PCA designed to protect the personal rights of defendants; instead, the PCA "expresses a policy that is for the benefit of the people as a whole."  *Walden*, 490 F.2d at 377.

Second, the exclusionary rule was developed to remedy violations of the Fourth Amendment, because the Amendment itself prescribes no means of enforcement.  *Figueredo-Diaz*, 718 F.3d at 573.  In contrast, Congress specifically prescribed the remedies for a PCA violation:  fine or imprisonment for not more than two years or both.  10 U.S.C. § 1385. Congress knows how to create a statutory suppression remedy, if Congress intends to provide that remedy.  *Minjares-Alvarez*, 264 F.3d at 986-87 (concluding that exclusionary rule does not apply to Vienna Convention violation, because the treaty does not expressly incorporate a

suppression remedy); *see United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (concluding that exclusionary rule is not available for violation of Electronic Communications Privacy Act when Congress did not prescribe suppression as a remedy; in contrast, Congress provided suppression as remedy for violation of statutes governing wiretaps).   Since Congress did not prescribe exclusion of evidence as a remedy in the PCA, the Court concludes that Congress did not intend the exclusionary rule to apply.   *See Minjares-Alvarez*, 264 F.3d at 986-87; *Holloway*, 531 Fed. Appx. at 583 (concluding that suppression is not available remedy, because PCA expressly provides only for fine or imprisonment).

Third, when Congress revisited the PCA in 1981 (and several more times)[11] and enacted new, related statutes, Congress again chose not to prescribe the exclusionary rule as a remedy. This despite the fact that Congress was aware that there had never been an officially reported prosecution under the PCA.   H.R. Rep. 97-71 (II), at 1787 ("According to a spokesperson for the Department of Justice, no one has been charged or prosecuted under the Posse Comitatus Act since its enactment."); Doyle, *The Posse Comitatus Act* 62.   Congress nevertheless declined to add to the criminal penalties prescribed.

Fourth, the Court concludes that exclusion is not justified by the deterrence function of the exclusionary rule.   As the Supreme Court recently stated:   "The [exclusionary] rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations."   *Davis*, 131 S. Ct. at 2426.   "The deterrence rationale for the exclusionary rule limits and guides its reach." *Figueredo-Diaz*, 718 F.3d at 574.   A need for additional deterrence is demonstrated when continued violations occur despite clear notice of what a statute proscribes.   But there is neither unambiguous statutory language nor authoritative court construction regarding the violations alleged in Defendants' case.   *See Walden*, 490 F.2d at 376-77.   Defendants have not

---

[11] Congress enacted four additional PCA exceptions, between 1986 and 2011.  10 U.S.C. §§ 379-82.

demonstrated the need for additional deterrence. *See id*. The Court concludes that the remedies prescribed by Congress for PCA violations (fine or imprisonment or both) provide sufficient deterrence—as for most criminal statutes.

### C. Widespread and repeated violations

Defendants argue that additional deterrence is required and urge this Court to adopt an exclusionary remedy. Defendants base their argument on the recent Ninth Circuit case of *Dreyer* and older opinions from other jurisdictions.

In a widely cited 1974 opinion, the Fourth Circuit held that the "extraordinary remedy of an exclusionary rule" was not warranted, but suggested, in dictum, that the Court might consider adoption of an exclusionary rule, in the future, upon evidence of widespread or repeated violations of the PCA or regulations. *See Walden*, 490 F.2d at 377 (4th Cir. 1974) (considering regulations extending PCA proscriptions to Navy). The Fourth Circuit later repeated this dictum. *United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005). Additional federal cases cited *Walden*'s dictum, but similarly held that adoption of an exclusionary rule for PCA violations was not warranted in the case before the court.[12] *See, e.g.*, *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979); *United States v. Hartley*, 796 F.2d 112, 115 (5th Cir. 1986); *Hayes v. Hawes*, 921 F.2d 100, 104 (7th Cir. 1990) (requiring "widespread and repeated violations" before court would consider exclusion); *United States v. Bacon*, 851 F.2d 1312, 1313 (11th Cir. 1988) (per curiam).[13]

---

[12] Although the Tenth Circuit cited *Walden*, in *Applewhite*, the citation was for the general purpose of the PCA—not for the dictum regarding remedy. *Applewhite*, 995 F.2d at 1001.

[13] The Court is aware of two state cases suppressing evidence, on inapplicable or unpersuasive analyses. *See State v. Pattioay*, 896 P.2d 911, 925 (Haw. 1995) (relying on court's supervisory power over lower courts and "judicial integrity" purpose for exclusionary rule); *Taylor v. State*, 645 P.2d 522, 524-25 (Okla. Crim. App. 1982) (2-1 decision) (suppressing on a case-by-case basis for "excessive" military intervention).

In addition to being dicta, most of these statements are in older opinions, suggesting an approach since expressly rejected by the Supreme Court.[14]   The Supreme Court observed the presence in its earlier cases of dicta suggesting an "expansive" approach to the scope of the exclusionary rule.  *Hudson*, 547 U.S. at 591; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  But the Court stated that it had "long since rejected that approach."  *Hudson*, 547 U.S. at 591.  Exclusion is not automatic—even for constitutional violations.   As the Court explained: "Suppression of evidence, however, has always been our last resort, not our first impulse."  *Id*.  The "expansive" approach rejected by the Supreme Court, moreover, was a suggestion in *Mapp* that all constitutional violations required suppression—not a suggestion that the exclusionary rule might be available for mere statutory violations.  *See Hudson*, 547 U.S. at 591; *Mapp*, 367 U.S. at 655.

In contrast to dicta in old cases, however, *Dreyer* is a very recent Ninth Circuit opinion adopting and applying the exclusionary rule for some PCA violations.  *United States v. Dreyer*, 767 F.3d 826 (9th Cir. 2014).  In *Dreyer*, a special agent of the Naval Criminal Investigative Service (NCIS) launched an investigation for online criminal activity "by anyone in the state of Washington, whether connected with the military or not."  *Id*. at 827.  He found evidence of child pornography on a civilian's computer, which information he turned over to civilian law enforcement officials; the civilian was convicted and sentenced to eighteen years in prison.  *Id*.  The majority held that the NCIS investigation violated the PCA and determined that all evidence should be suppressed.  *Id*.   The concurrence agreed based on the finding that the Navy had

---

[14] Indeed, more recent opinions from some of the circuits cited in the preceding paragraph show these circuits no longer suggesting an expansive approach to the exclusionary rule.  *See, e.g.*, *United States v. Clenney*, 631 F.3d 658 (4th Cir. 2011) (in case involving Electronic Communications Privacy Act, following different analysis than *Walden* and holding that exclusionary rule is not available for statutory violation when statute does not prescribe exclusion); *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014) (holding there is no basis for judicial imposition of exclusionary rule for violation of Stored Communications Act, when Congress specified remedies but did not include exclusion).

committed "widespread and repeated" violations—emphasizing that there were "massive" violations (more than in other cases found) with no "bona fide military purpose." *Id.* at 837-38. Observing that the PCA's criminal penalties apply only to the Army and the Air Force,[15] the concurrence then suggested that the exclusionary rule would not be justified if the PCA's criminal penalties applied to the Navy:  "Without the criminal penalty, the exclusionary rule is about all that the judiciary has to deter such widespread and repeated Posse Comitatus violations as we have here." *Id.* at 838.   The third judge dissented on the issue of the remedy, characterizing the majority's decision to impose a "disfavored remedy" as "a breathtaking assertion of judicial power."  *Id.* at 839 (O'Scannlain, J., concurring in part and dissenting in part).

For several reasons, *Dreyer* does not alter this Court's decision.

The Court first notes that *Dreyer* is a 2-1 decision, with the concurring judge suggesting that he agreed because the PCA's criminal penalties did not apply to the Navy investigator in that case; there was no deterrent unless the exclusionary rule applied.  *Id.* at 838 (Kleinfeld, J., concurring).  *Dreyer* recognizes that "'an exclusionary rule should not be applied to violations of 10 U.S.C. §§ 371-378 until a need to deter future violations is demonstrated.'"  767 F.3d at 836-37 (quoting *United States v. Roberts*, 779 F.2d 565, 568 (9th Cir. 1986), *superseded by statute on other grounds as recognized in United States v. Khan*, 35 F.3d 426, 432 n.7 (9th Cir. 1994)).  In the case before this Court, the PCA's criminal penalties would be applicable to an Army CID investigator.

Second, two judges in *Dreyer* found evidence of "widespread and repeated violations," *Id.* at 837.  *Dreyer* found that the NCIS agent "surveyed *the entire state of Washington* for

---

[15] Although the statute's criminal penalties only apply to the Army and Air Force because they are the only military branches specified in § 1385, "PCA-like restrictions" apply to the Navy under Department of Defense regulations and Navy policy.  *Dreyer*, 767 F.3d at 830; *Chon*, 210 F.3d at 993.

computers sharing child pornography" and searched "the entire civilian population," resulting in "massive" violations of the PCA. *Id*. at 833-35, 838. Although these two judges stated that the violations were "repeated," they used the term only in the same sense that they found "widespread" violations. *Id*. at 837-38 (finding that "the violation at issue has occurred repeatedly and frequently," or was "repeated against every Gnutella user in Washington"). This Court concludes, however, that the sense in which "repeated" is relevant to the deterrent function of the exclusionary rule requires that, despite clear warning, people continue to commit a particular violation; "repeated" does not mean the same thing as "widespread."

In the case before the Court, the Government's witness, Special Agent Rhodes, testified that his office has about sixty-five open investigations regarding G-RAP, most of them involving New Mexico. [Tr. 9-16-14, pp. 109-10, 128] The Government stated that "it is undisputed that Army CID conducted these investigations across the country." [Tr. 9-16-14, p. 7] Defendants presented an exhibit showing that G-RAP paid out more than $300,000,000 for more than 130,000 enlistments. [Exhibit B, p. 2] Defendants have not presented the Court with evidence showing investigations additional to those to which Special Agent Rhodes testified. Even assuming arguendo that sixty-five investigations like the one against Defendants constituted PCA violations, Defendants have not demonstrated that sixty-five investigations constitute "widespread" violations—in view of the totals of 130,000 enlistments and $300,000,000. In addition, the Court does not find evidence of "repeated" PCA violations, in the sense relevant to the deterrent function of the exclusionary rule: continued conduct following notice that conduct is illegal. Assuming arguendo that the sixty-five investigations violate the PCA, they constitute contemporaneous violations—not continued violations subsequent to notice of illegality. *Cf. Connick v. Thompson*, ___ U.S. ___, 131 S. Ct. 1350, 1360 & n.7, 179 L. Ed. 2d 417 (2011)

(stating that a pattern of similar constitutional violations cannot be established by a number of contemporaneous actions).  Defendants have not demonstrated a need for additional deterrence.

Third, and most important, the Court concludes that *Dreyer* is a throwback to "expansive" use of the exclusionary rule—an approach expressly rejected by the Supreme Court. *See Hudson*, 547 U.S. at 591.  This Court concludes that Defendants' argument is contrary to Supreme Court and Tenth Circuit caselaw.

### D.  Conclusion on exclusionary rule

The Court fully recognizes that there have been no criminal prosecutions under the PCA.  Although some courts consider this a reason to take it upon themselves to adopt the exclusionary rule as an additional sanction, the issue before this Court is not whether PCA violations should be punished but, instead, what remedy Congress intended in the event of violation.  It is the role of the executive branch—not the courts—to decide whether to prosecute and punish.  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).  In contrast to the Fourth Amendment, the PCA itself includes an enforcement mechanism—criminal prosecution, with expressly stated criminal penalties.  Lack of prosecutions under the PCA do not mean that the statute is "toothless," but that the executive branch has exercised its broad discretion not to initiate prosecutions.

### CONCLUSION

The Court concludes that Army CID did not violate the PCA; because the investigation of Defendants was undertaken for "independent military purposes," this investigation falls within an exception to the PCA.  The Court also concludes that the exclusionary rule would not be an available remedy for a PCA violation.  On these independent and alternative bases, the Court denies Defendants' motion to suppress.

**IT IS THEREFORE ORDERED** that Defendants' *Motion To Suppress Evidence Collected by U.S.C. Title 10 Active Duty Army Investigators* [Doc. 22] is **DENIED.**


**UNITED STATES DISTRICT JUDGE**